IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KEITH AMEYAW,**

       **Plaintiff,**                          Case No. 2:21-cv-5039
                                               Judge Edmund A. Sargus, Jr.
     v.                                   Magistrate Judge Kimberly A. Jolson

**DELAWARE COUNTY COMMISSIONERS,** *et al.***,**

       **Defendants.**

**OPINION AND ORDER**

This matter is before the Court on Defendant Deputy Jesse Rodriguez-Lipps' Motion for Summary Judgement.[1] (ECF No. 37.) For the following reasons, the Court **DENIES** Defendant's motion.

**I.**

The facts set out below are taken from the evidence of record before the Court. On October 27, 2019, Plaintiff Keith Ameyaw was traveling southbound on U.S. Route 23 in Delaware County, Ohio. At 4:01 p.m., Defendant Jesse Rodriguez-Lipps, a deputy sheriff for the Delaware County Sheriff's Office assigned to road patrol, stopped Plaintiff's vehicle because the officer was unable to observe a visible license plate. Recordings from Defendant's patrol cruiser's in-car camera and his body-worn camera captured some of their interactions for the next few minutes.

After stopping Plaintiff, Defendant Deputy exited his patrol vehicle and approached Plaintiff's vehicle, a white Porsche SUV with an upside-down North Carolina license plate taped

---

[1] As originally filed, Defendant's motion also moved for summary judgment on behalf of former Defendants Delaware County Commissioners, County of Delaware, and former Delaware County Sheriff Russell Martin. The Court, however, has since dismissed these Defendants from this action pursuant to Plaintiff's unopposed motion to dismiss. (ECF No. 44.)

1

to the rear window.  Defendant informed Plaintiff, an African American man, that he stopped his vehicle because his license plate was not visible, which Plaintiff disputed.  Defendant Deputy asked Plaintiff for his driver's license and insurance information and asked him where he was traveling.  Plaintiff answered that he was coming from Michigan and was bound for Georgia.

Defendant Deputy testified that during this interaction, Plaintiff appeared nervous and was generally avoided making eye contact.  Defendant also observed Plaintiff pick up a Gucci bag and rest his hand on an object inside the bag, causing Defendant to step back from Plaintiff's vehicle and place his own hand near his firearm.  Plaintiff then removed his empty hand from the bag and proceeded to gather his driver's license and proof of insurance without incident.

At approximately two minutes into the traffic stop, Defendant walked to the rear of Plaintiff's vehicle to inspect the license plate, which Plaintiff had taped upside down to the rear windshield.  Defendant believed the license plate was improperly displayed, thus violating Ohio's statutory requirements.

Defendant then returned to his patrol cruiser, where he reported Plaintiff's name and driver's license information to dispatch.  He also began searching the cruiser's mobile data terminal with Plaintiff's information.  At approximately three minutes into the traffic stop, the Sheriff's Department dispatch relayed to Defendant that the Porsche was properly registered to Plaintiff and that Plaintiff had a validly issued Michigan driver's license.

Defendant Deputy requested canine assistance as he suspected drug activity based on his assessment of Plaintiff's behavior (*i.e.*, Plaintiff's initial nervousness, his general avoidance of eye contact, and the manner in which he reached into his Gucci bag), the location of the traffic stop (Defendant recognized U.S. Route 23 as a common corridor for drug trafficking), and

2

Plaintiff's stated travel plans to drive from Michigan to Georgia (two port states) while operating a vehicle with a North Carolina license plate.

At approximately four and a half minutes into the traffic stop, dispatch confirmed that Deputy John Laudeman and his canine partner were enroute. Another officer, Deputy Close, arrived as back-up to assist with the traffic stop. She approached Plaintiff, walking up to the passenger-side window of his vehicle, and spoke with him for several minutes. While speaking with Plaintiff, Deputy Close observed several high-priced designer clothes in the vehicle. Further, she learned from Plaintiff that he was in the military as an E-4 in rank. She did not, however, observe any signs of Plaintiff appearing nervous, avoiding eye contact, or making furtive gestures. Deputy Close returned to Defendant's cruiser and conveyed this information to him.

During the same period Deputy Close was speaking with Plaintiff, Defendant continued investigating Plaintiff's information, such as his criminal history and whether he had any outstanding warrants. This involved checking Ohio Law Enforcement Gateway, various clerk of courts websites in North Carolina based on Plaintiff's driver's license and the Michigan county where Plaintiff's vehicle was registered, as well as running Google searches.

At just under ten minutes into the traffic stop, Deputy Laudeman arrived at the scene with his canine partner. Defendant remained in his cruiser, continuing to investigate Plaintiff. A minute later, Deputy Laudeman and his canine partner began conducting a free-air sniff of Plaintiff's vehicle. In less than 30 seconds, the canine registered a "hit" on Plaintiff's vehicle, indicating the presence of possible narcotics in the vehicle. Upon seeing the "hit," Defendant stopped investigating Plaintiff and exited his cruiser to conduct a search of Plaintiff's vehicle.

Approximately eleven minutes into the traffic stop, Defendant asked Plaintiff to step outside of his vehicle. Plaintiff complied, and Defendant proceeded to conduct a pat-down search of Plaintiff. Approximately two minutes later, Defendant, with Deputy Close's assistance, performed a search of Plaintiff's vehicle.

Approximately fifteen minutes into the traffic stop, Deputy Close located a loaded handgun in the Gucci bag in which Plaintiff had retrieved his license earlier. Plaintiff was then handcuffed and placed under arrest in the rear of Defendant's cruiser. For the next ten minutes, Defendant and Deputy Close searched Plaintiff's vehicle. No drugs or contraband were found during the search. Defendant did, however, inform Plaintiff that he would be charged with improper handling of a firearm under Ohio Revised Code § 2923.16(E)(1).

Defendant then transported Plaintiff to the Delaware County Jail, where Plaintiff remained for half a day until he was released. Nine months later, the municipal prosecutor dismissed the criminal charge of improper handling of a firearm that Plaintiff was charged by Defendant Deputy.

In response to these events, Plaintiff brought the instant action against Defendant, the County of Delaware, Delaware County Commissioners, and former Delaware County Sheriff Russell Martin (the "County Defendants"). The Complaint alleges two counts: Count 1, brought pursuant to 42 U.S.C. § 1983, alleges that Defendant unlawfully seized Plaintiff, violating Plaintiff's Fourth and Fourteenth Amendment rights; and Count 2 raises a claim against the County Defendants. (*See id.* ¶¶ 36-50.)

On March 31, 2023, Defendants filed the pending summary judgment motion, seeking dismissal of both counts. (*See* ECF No. 37.) Plaintiff filed his opposition to Defendant's motion (ECF No. 42) while simultaneously moving to dismiss his claim against the County Defendants

4

(ECF No. 41), which the Court permitted (ECF No. 44). On June 2, 2023, Defendant filed his Reply in support of his motion. (ECF No. 43.) Consequently, only one claim remains against one defendant.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also*

5

*Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Finally, "where, as here, there is a videotape capturing the events in question, the court must view the facts in the light depicted by the videotape." *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (internal quotation marks omitted and alterations adopted).

### III.

Plaintiff asserts that Defendant Deputy violated his constitutional rights under the Fourth and Fourteenth Amendments when Defendant unlawfully seized and detained him longer than was necessary to effectuate the initial purpose of the traffic stop (*i.e.*, to investigate whether Plaintiff's vehicle had a properly displayed license plate).

**A.    Law**

Plaintiff predicates his claim upon 42 U.S.C. § 1983, which "provides a cause of action for deprivation under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States. To succeed on a Section 1983 claim, the plaintiff must satisfy two elements: first, that he was deprived of a right secured by the Constitution or the laws of the United States; and second, the deprivation was caused by a person acting under color of state law. *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001); *Green v. Throckmorton*, 681 F.3d at 859–60 (6th Cir. 2012).

Plaintiff alleges a constitutional violation of the Fourth Amendment, which bars "unreasonable . . . seizures," which the Supreme Court has interpreted as prohibiting police officers from prolonging a traffic stop beyond the time necessary to investigate the initial traffic violation unless the officer has reasonable suspicion that the seized vehicle's occupants are engaged in other criminal conduct. *Rodriguez v. United States*, 575 U.S. 348, 354–56 (2015). The Supreme Court explained the law concerning the permissible duration of a traffic stop:

6

> A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest. [*Terry v. Ohio,* 392 U.S. 1 (1968)]. Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.
>
> . . . .
>
> [T]he Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention. . . . [A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket. . . . The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop. An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

*Rodriguez*, 575 U.S. at 354–55.

In addition to defining the contours of the lawful duration of a traffic stop, the *Rodriguez* Court also identified the tasks that may be necessary to "complete the mission of issuing a warning ticket":

> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez*, 575 U.S. at 355; *see also United States v. Bell*, 555 F.3d 535, 542 (6th Cir. 2009) ("[w]aiting for the results of the license check was clearly within the purpose of the initial stop" and "any time that the [o]fficers spent in pursuing other matters while the background check was processing, even if those matters were unrelated to the original purpose of the stop, did not extend the length of the stop").

7

"In assessing whether a [stop] is too long in duration . . . , we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). That is to say, the touchstone of the analysis is "*the officer's diligence*—i.e., his 'persevering' or 'devoted . . . application to accomplish [the] undertaking' of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket." *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010) (citation omitted). This requires a court to evaluate the officer's diligence "under the totality of the circumstances." *Id.*

Administering a dog sniff, however, cannot properly be characterized as incidental to the officer's traffic mission. *Rodriguez*, 575 U.S. at 355–57. Officers may engage in a dog sniff during the time that they undertake the traffic-related tasks necessary to the violation that triggered the stop. *Id.* at 354–55; *Illinois v. Caballes*, 543 U.S. 405, 406–409 (2005) (noting that a canine officer may walk her dog around a car while another officer completes a ticket). Conducting a canine sniff can turn a lawful stop into an unreasonable seizure if it "prolongs—*i.e.*, adds time to—the stop." *Rodriguez*, 575 U.S. at 357 (cleaned up). Thus, "[o]nce a stop begins, . . . detaining the motorist any longer than is reasonably necessary to issue the traffic citation requires reasonable suspicion that the individual has engaged in more extensive criminal conduct." *United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010). Officers may "extend a stop to conduct a dog sniff when such action is supported by reasonable suspicion of criminal activity." *United States v. Salas*, 820 F. App'x 405, 412 (6th Cir. 2020).

**B.     Analysis**

Based on the law set forth above, this Court considers three issues: (1) whether Defendant Deputy prolonged the stop beyond the time necessary to resolve the license-plate

8

violation; (2) if Defendant did prolong the stop, did he have reasonable suspicion to believe that Plaintiff was engaging in other crimes that would support a dog sniff, and (3) whether Defendant is entitled to qualified immunity.

      **1.     A reasonable jury could find that Defendant prolonged the stop.**

The evidence here as to whether Defendant Deputy prolonged the traffic stop of Plaintiff beyond the time necessary to resolve the license-plate violation, points in different directions. In such a situation, the Sixth Circuit has directed that answering this question turns on the "historical facts" of this case—a determination best left for the jury. *Klaver v. Hamilton Cnty.*, Case Nos. Nos. 22-5083/5084, 2022 U.S. App. LEXIS 30642, at *10 (6th Cir. Nov. 3, 2022) (citing, *inter alia*, *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966; *Hernandez v. Boles*, 949 F.3d 251, 257–58 (6th Cir. 2020); *United States v. Howard*, 815 F. App'x 69, 75–76 (6th Cir. 2020)).

There is evidence, on the one hand, that would support the conclusion that Defendant Deputy did not prolong the traffic stop beyond the time necessary to investigate the initial traffic violation. Both Defendant and Deputy Passet testified that a traffic stop, including the subsequent investigation and issuance of a citation, typically takes between ten and twenty minutes. (Rodriguez Dep. 40:10-41:1, ECF No. 32; Passet Dep. 19:2-16, ECF No. 35.) The arrival of the canine and its ensuing alert occurred less than twelve minutes into the traffic stop—well within the range for a typical stop. In addition, Defendant's testimony and body-worn camera indicates that he was using his cruiser's mobile data terminal for investigative purposes incidental to the traffic stop when Deputy Laudeman and his canine partner arrived. (Rodriguez Dep. 129:15-21; Rodriguez Decl. ¶ 1; Pl. Dep. Ex. 5 at 00:09:42.) Moreover, Defendant testified that, due to Plaintiff's out-of-state license plate and interstate travel, he needed additional time to complete the investigation into Plaintiff's background when compared to a local motorist.

9

(Rodriguez Dep. 40:10-41:1; Rodriguez Decl. ¶ 2.)  Defendant then points to the fact that he had not yet begun drafting a traffic citation or written warning when the canine alerted, which, according to Defendant, indicates that he was still completing tasks incident to the traffic stop at that time.

On the other hand, there is evidence to support a finding that Defendant Deputy did prolong the traffic stop beyond the time necessary to investigate the initial traffic violation.  First, he requested canine assistance at approximately three minutes into the traffic stop, which did not relate to the purpose of the traffic stop.  Further, Defendant's body-worn camera shows him actively utilizing his cruiser's mobile data center, but, due to the quality of the video recording, the extent of websites Defendant searched and whether such searches were incidental to the traffic stop is unclear, as well as whether Defendant conducted these searches with appropriate diligence.  For example, at one point while using his cruiser's mobile data center, Defendant initiated a Google search that appeared to return a series of t-shirt advertisements. "[A]n officer may not avoid this rule by 'slow walking' the traffic-related aspects of the stop to get more time to investigate other crimes." *Klaver*, 2022 U.S. App. LEXIS 30642, at *9 (citing *Untied States v. Whitley*, 34 F.4th 522, 531–32 (6th Cir. 2022)).  Defendant also failed to even begin drafting a traffic citation or written warning by the time Deputy Laudeman arrived at approximately ten minutes into the traffic stop.  Deputy Passet testified, in the absence of issuing a ticket or warning, a traffic stop typically takes about five minutes.  (Passet Dep – 29:17-19.)

Moreover, when Deputy Close arrived at approximately six minutes into the stop, Defendant instructed her to speak with Plaintiff.  This directive occurred after Defendant had already verified Plaintiff's license and registration and made the ordinary inquiries incident to the traffic stop, and thus could be reasonably considered to fall outside of the checklist of tasks

the Supreme Court articulated in *Rodriguez*. 575 U.S. at 355. That is to say, a reasonable jury could find that by sending Deputy Close to talk with Plaintiff, Defendant did not "diligently pursue[] a means of investigation that was likely to confirm or dispel [his] suspicions quickly" that Plaintiff had committed a license-plate violation. *See Sharpe*, 470 U.S. at 686. The same could be said for Defendant's use of his cruiser's mobile data terminal while he waited for Deputy Laudeman and his canine partner to arrive.

When viewing the evidence in the light most favorable to Plaintiff, a reasonably jury may, or may not, find that Defendant prolonged the traffic stop beyond the time necessary to investigate the traffic violation. Thus, Plaintiff has raised genuine issues of material fact that are for a jury to determine.

**2.  A reasonable jury could find that Defendant did not have reasonable suspicion to prolong the stop.**

Because a jury could reasonably find that Defendant Deputy prolonged the stop, he would violate the Fourth Amendment under the Plaintiff's version of the facts unless he had "independent reasonable suspicion" for that extended seizure. *Boles*, 959 F.3d at 256; *United States v. Sheckles*, 996 F.3d 330, 344 – 45 (6th Cir. 2021). "The reasonable-suspicion test is not a particularly 'demanding' one." *Klaver v. Hamilton Cnty.*, 2022 U.S. App. LEXIS 30642, at *8 (6th Cir. Nov. 3, 2022) (quoting *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020)). It sets a lower standard than probable cause, which itself does not set a "high bar." *Id*. (citing *Sheckles*, 996 F.3d at 343) (citation omitted).

To have reasonable suspicion here, Defendant Deputy needed a "particularized" belief (that is, one tied to Plaintiff) and an "objective" belief (that is, one tied to articulable facts rather than amorphous hunches) that Plaintiff engaging in other crimes. *Id*. (quoting *Glover*, 140 S. Ct. at 1187 (citations omitted). The Court looks to the totality of the circumstances available to

11

Defendant Deputy when he acted to decide whether they met this test.  *Cortez*, 449 U.S. at 417-18.

Defendant Deputy identifies five pieces of evidence as grounds for reasonable suspicion to believe Plaintiff was engaging in other crimes:  (1) Plaintiff initially appeared nervous during the stop; (2) Plaintiff was avoiding making eye contact early during the interaction; (3) Plaintiff made furtive hand movements when asked to provide his driver's license by placing his hand inside his Gucci bag without looking inside, and resting his hand in the bag and staring at Defendant. He then retrieved his license from an entirely different area from the car; (4) the location along State Route 23 was known by Defendant and the Delaware County Sheriff's Office as a heavily trafficked corridor for drug activity; (5) Plaintiff's stated travel plans were to drive from Michigan to Georgia, both well-known port states for drug trafficking.  (Defs' Reply at 14–15, ECF No. 43.)

Each of these factors, however, are weak indications of criminal activity.  The Sixth Circuit has cautioned district courts not to "cavalierly" invoke an individual's alleged nervous or furtive behavior when assessing reasonable suspicion, *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006), and generally gives nervousness "very limited or no weight" in a traffic-stop setting, *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008).  A detainee's nervous demeanor, furtive behavior, or lack of eye contact are generally "unreliable indicator[s], especially in the context of a traffic stop." *Id*.  This factor is appropriately relied upon "only when a suspect 'was exhibiting visible signs of nervousness beyond' the usual level in traffic stops and only in combination with other more suspicious factors."  *Klaver*, 2022 U.S. App. LEXIS 30642, *17 (citing *United States v. Campbell*, 511 F. App'x 424, 428 (6th Cir. 2013) and *United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016)).

With regard to the location of the stop, State Route 23, and Plaintiff's travel plans, Michigan and Georgia, they too fail to carry much weight.  As pointed out by a sister district court, a "court must of course credit to some degree [the defendant deputy's] observation that criminals sometimes transport drugs on [that particular highway], but the same can unfortunately be said of virtually every highway in our nation."  *United States v. Maddox*, 2010 U.S. Dist. LEXIS 128062, *9–10 (E.D. Tenn. Dec. 2, 2010).  Traveling on this type of highway "is not an inherently suspicious activity, and under a totality of the circumstances analysis this factor supports reasonable suspicion in only a minor way."  *Id*.

Travel plans are relevant to reasonable suspicion analysis.  *Stepp*, 680 F.3d at 666. The Sixth Circuit has "placed weight on implausible travel plans," especially where traveling companions report inconsistent details about their plans. *Id*. (citing *United States v. Hill*, 195 F.3d 258, 272 (6th Cir. 1999).  In this case, Defendants' travel itinerary was not so out of the ordinary or "far-fetched" as to support reasonable suspicion.  *United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002).  Further, the Court notes that Defendant cooperated with every request Defendant made and timely provided all documentation requested.

It is possible for factors, although insufficient individually, to add up to a reasonable suspicion, as is the nature of the totality of the circumstances test.  But "it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."  *Karnes*, 62 F.3d at 496.  "[B] behavior that is consistent with innocent activity cannot suffice to establish reasonable suspicion."  *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (citing *Fla.v. Royer*, 460 U.S. 491, 512 (1983)).  In the case *sub judice*, the factors upon which Defendant relies to provide reasonable suspicion can

13

reasonably be viewed as wholly innocent and there are no concrete reasons for these innocent reasons to combine into a suspicious conglomeration.

The Court concludes that a reasonably jury, when reviewing the evidence in the light most favorable to the Plaintiff, could conclude that Defendant lacked reasonable suspicion that Plaintiff was committing other crimes. Thus, the question of whether Defendant Deputy unreasonably prolonged the stop is properly reserved to a jury.

### 3. Qualified Immunity

Section 1983 claims are subject to the affirmative defense of qualified immunity which, if applicable, shields individuals from liability. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Qualified immunity protects state officials so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, (1982) (citations omitted). Thus, "officers are entitled to qualified immunity under §1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U. S. 658, 664 (2012)).

Defendant, correctly, does not argue that the law applicable to this case was not clearly established. Instead, he contends that "the evidence shows that there was no constitutional violation, [so] Deputy Rodriguez is entitled to qualified immunity and, accordingly, summary judgment on Plaintiff's claims." (Mot. Summ. J. at 12, ECF No. 37; Def's Reply at 18, ECF No. 43.) Defendant further contends that "Plaintiff relies on blatant factual misstatements and mischaracterizations to fabricate a constitutional violation which the record proves never happened. These efforts do not defeat Deputy Rodriguez's qualified immunity." *Id*.

As set forth above, this Court disagrees with Defendant's assessment of what the evidence shows. When viewing the evidence in the light most favorable to Plaintiff, a reasonably jury may, or may not, find that Defendant prolonged the traffic stop beyond the time necessary to investigate the traffic violation. The shield of qualified immunity does not immunize Defendant from allowing a jury to resolve this factual dispute. *See Gambrel v. Knox Cty.*, 25 F.4th 391, 400 (6th Cir. 2022) ("So when deciding whether force was excessive or whether our precedent clearly established that result, we must view genuine factual disagreements in the light most favorable to the plaintiff. If a reasonable jury could credit the plaintiff's version of events and if that version clearly shows the excessive nature of the defendants' force, we cannot grant the officers summary judgment.")

## IV.

For the reasons set forth above, the Court **DENIES** Defendant Deputy Jesse Rodriguez-Lipps' Motion for Summary Judgement. (ECF No. 37.) This case remains open.

**IT IS SO ORDERED**.

**9/5/2023**  
**DATE**

s/Edmund A. Sargus, Jr.  
**EDMUND A. SARGUS, JR.**  
**UNITED STATES DISTRICT JUDGE**